36 285
96 10

## McMANUS *vs.* THE STATE.

[INDICTMENT FOR MURDER.]

1. *Manslaughter.*—If death ensues from the intentional application of unlawful force, though there may have been no specific intention to kill, and though the weapon used is not ordinarily calculated to produce death, the perpetrator is guilty of manslaughter in the first degree under the statute of this State, (Code, §§ 3084–85,) as he would be guilty of voluntary manslaughter at common law. (A. J. WALKER, C. J., *dissenting.*)

2. *Relevancy of prisoner's subsequent acts and declarations as evidence.* Under an indictment for murder, it having been shown that the prisoner and the deceased, while on a drunken frolic, had an altercation together, which resulted in a fight between them ; that the prisoner struck the deceased with a brick-bat during the fight, and that the latter died from the effects of the blow during the following night,—it is competent for the State to prove, " that about a half-hour after the blow had been given, and after the fight was entirely over, and after the parties had left the place where the fight occurred, the prisoner went to the place where the deceased was, with a pistol in his hand, and said he had come to kill the damned old rascal."

FROM the Circuit Court of Lowndes.
Tried before the Hon. ROBERT DOUGHERTY.

THE prisoner in this case was indicted in Montgomery

county, at the January term of the circuit court, 1859,
for the murder of Stewart Dillard, "by striking him with
a brick-bat." The venue was changed, on the prisoner's
application, to Lowndes county, where he was tried at
the November term, 1859, and convicted. The facts of
the case, as disclosed on the trial, are thus stated in the
bill of exceptions:

"The proof showed that, in January, 1859, in Mont-
gomery county, the prisoner and the deceased, while on
a drunken frolic, had an altercation together, which re-
sulted in a fight between them; that the prisoner, during
the fight, threw at the deceased a piece of brick, as large
as one-fourth, or one-half of a brick, which struck the
deceased on the side of the head; and that the deceased
died during the night of the day on which said fight
occurred. Some proof in the cause tended to show, that
the blow from said brick-bat produced concussion of the
brain, which caused the death of the deceased; while
other proof tended slightly to show, that the deceased
died from the effects of excessive intoxication. There
was some proof tending to show, that the prisoner struck
said blow with malice, and under such circumstances as
would make the killing murder if death ensued; and
there was also proof tending to show, that he struck said
blow in the heat of passion, and without malice, and
under such circumstances as would make the killing man-
slaughter if death ensued from said blow. There was
some proof, also, tending to show that the blow was struck
in self-defense; and other proof tending to show, that
said blow was struck in a fight between the parties, mu-
tually and willingly engaged in on equal terms, and was
not struck with any intention to kill; and that as struck
with the weapon used death would ordinarily be very un-
likely to ensue. The State offered to prove, that about
a half-hour after the blow had been given, and after the
fight was entirely over, and after the parties had left the
place where the fight occurred, the prisoner went to the
place where the deceased then was, with a pistol in his
hand, and said 'that he had come to kill the damned old
rascal,' meaning the deceased. The prisoner objected

McManus v. The State.

to the introduction of this evidence; the court overruled his objection, and he excepted.

"The foregoing being, in substance, all the evidence in the case, the court thereupon charged the jury, acceptably to the prisoner, in relation to the law of murder, manslaughter in the first degree, and self-defense. The court also charged the jury, that if they believed from the evidence that said blow caused the death of the deceased, and was not struck in self-defense, but was struck voluntarily, then the lowest grade of offense, of which the prisoner could be found guilty, was manslaughter in the first degree; and to this charge the prisoner, by his counsel, excepted.

"The prisoner asked the court to give the following written charge: 'If the jury believe from the testimony that the deceased came to his death by a blow inflicted by the prisoner, by the throwing of a piece of brick; and that said blow was inflicted in the progress of a fight between the prisoner and the deceased, willingly commenced and prosecuted; and that after the commencement of the fight, and during its progress, both parties were on equal terms, or equally armed: and that the defendant threw the piece of brick in the fight, not intending to kill; and that the throwing and striking with such a piece of brick, under the circumstances, and in the mode and manner that the proof shows the prisoner did it in this case, would not be likely to produce death,— then the prisoner may be found guilty of involuntary manslaughter.' The court refused to give this charge, and the prisoner excepted."

Wm. L. Yancey, and Thos. J. Judge, for the prisoner. To constitute manslaughter in the first degree, under our statute, there must be an intention to kill, either actual or implied. If there be no proof of an actual intent, an implied intention may be inferred from the use of a deadly weapon. But, if the weapon used be of such a character as to negative such implied intent, and there be no proof of an actual intent, the party cannot be found guilty of a higher offense than manslaughter in the second

degree. The charge of the court violated the distinction between the two degrees of manslaughter, and ignored the question of intent as an element of the crime; instructing the jury, in effect, that they must find the prisoner guilty of the first degree of manslaughter, although he did not intend to kill the deceased, although the weapon used was not ordinarily calculated to produce death, and although it was used in a manner very unlikely to produce death. In Oliver's case, (17 Ala. 587,) the weapon used was a gun—an instrument deadly in its nature, likely to produce death, made, indeed, for the express purpose of killing. Hence, the plain distinction between that case and this.

M. A. BALDWIN, Attorney-General, contra.—The true distinction between the first and second degrees of manslaughter, under the Code, (§§ 3084-85,) is, that in the first the act producing the death must be voluntarily done, and in the other accidental.—Oliver v. The State, 17 Ala. 601; People v. Rector, 19 Wendell, 592; People v. Clark, 3 Selden, 392; Commonwealth v. Biron, 4 Dallas, 125; Sludstill v. The State, 7 Geo. 14; Beets v. The State, 1 Meigs, 106; Ann v. The State, 11 Humph. 164; Commonwealth v. Gable, 7 Serg. & R. 428; Wharton's Amer. Crim. Law, (4th ed ) §§ 932-33; Archbold's Crim. Law, 211, 226; East's P. C. 232, 241, 255, 257, 266. Involuntary manslaughter is the killing in the performance of an unlawful act, without intent to do bodily harm. Roscoe, 681.

STONE, J.—Manslaughter, at the common law, was divided into voluntary and involuntary. Voluntary manslaughter included all felonious homicides, less heinous than murder, which resulted directly from any unlawful force, aimed at, and applied to the party slain. It was not necessary that the perpetrator should have intended or willed the death of the party. The force being unlawful, and intentionally directed against the deceased, the law pronounced the consummated act—the manslaughter—to be voluntary.—Com. v. Gable, 7 Serg. &

R. 428; People v. Rector, 19 Wendell, 592–3; Whar. Am. Cr. Law, § 932; Whar. Am. Law of Hom. 35; Whar. Am. Cr. Law, §§ 978, 971, 976, 987; 2 Bish. Cr. Law, § 659; 4 Black. Com. 191; Respublica v. Biron 4 Dallas, 125; Johnson's case, 5 Grat. 660; State v. Jarrott, 1 Ired. 76. Involuntary manslaughter included all those homicides which were below the grade of murder, and were neither justifiable nor excusable, and which were the accidental result of some unlawful act, less than a felony, not aimed or directed against the person slain. Whar. Amer. Cr. Law, § 933; Whar. Am. Law of Hom. 35; Whar. Am. Cr. Law, 1002; 4 Bla. Com. 192; Ann v. The State, 11 Humph. 164.

The framers of our penal code have employed language somewhat different. Their classification is as follows: " § 3084. Every person convicted of the crime of manslaughter, by voluntarily depriving a human being of life, is guilty of manslaughter in the first degree." " § 3085. Every person convicted of manslaughter, under any other circumstances than those expressed in the preceding section, is guilty of manslaughter in the second degree."

That it was not the intention of the legislature to reduce any of the common-law murders to the crime of manslaughter, is shown by sections 3080 and 3081 of the Code. Section 3080 defines murder in the first degree, and section 3081 declares, that all other common-law murders, not embraced in section 3080, are murders in the second degree. It is thus shown, that all common-law murders are statutory murders, either in the first or second degree.

While the definition of voluntary manslaughter, as given above, cannot be controverted, it is contended, that our statute has introduced a different rule—namely: that to come within the section which defines manslaughter in the first degree, it is not enough that the force which causes the death be direct and intentional, but that the intention and will shall go further, and contemplate the killing itself; in other words, that the "voluntarily depriving a human being of life," mentioned in the statute,

cannot take place in the absence of a specific intention in the perpetrator to take the life of his victim.

In looking into the statutes of some of the other States, we have found no provision which is expressed in the language of ours. Neither has the precise question presented by this record ever been before this court, in the form in which it is here presented. In the case of Oliver v. The State, (17 Ala. 587,) this statute came under review. The 3d charge in that case presented substantially the same question as the one we are now considering, with the exception that, in that case, the homicide was committed with a deadly weapon, while the record in this case informs us that from the blow, " as stricken with the weapon used, death would ordinarily be very unlikely to occur." Considering the evidence recited in this record, in the light of the verdict of the jury upon that evidence, we feel justified in assuming that the death was caused by a piece of brick—as much as a fourth or a half—which was cast by the prisoner at the deceased, and struck the latter on the side of the head, causing concussion of the brain and death.

In Oliver's case, it seems to have been conceded, on both sides, that a specific intention to kill was a necessary ingredient in every manslaughter in the first degree. On the one hand, it was contended, that the employment of the deadly weapon, which caused the death in that case, furnished the proof of a specific intention to kill; while this proposition was denied on the other. Some of the expressions in that opinion, viewed abstractly, would incline us to the opinion, that the court recognized a specific intention to kill, as necessary to constitute manslaughter in the first degree. Other expressions, however, are inconsistent with this view, and lead us to the conclusion, that what the court said, tending to the opinion last above noted, must have been in reply to objections and points taken in that case. This, we think, is shown by the fact, apparent in the report of that case, that no distinction seems to have been taken between our statutory manslaughter in the first degree, and voluntary manslaughter at the common law. So far from this being

McManus v. The State.

done, there are many expressions in that opinion, which induce us to believe that the specific intent to kill, there impliedly recognized, would have been held to apply alike to voluntary manslaughter at the common law, and to our statutory manslaughter in the first degree.

A further support to our view, stated above, is found in the fact, that, in Oliver's case, there are evidences that this court entertained the opinion, that the prisoner might be guilty of a higher grade of homicide than manslaughter in the first degree.

We do not think Oliver's case ought to be recognized as an authority on the question we are considering, because in that case the record did not raise the point.

We confess ourselves unable to distinguish between *voluntary manslaughter*, and manslaughter by *voluntarily depriving a human being of life.* Manslaughter is the unlawful killing of a human being, without malice. To kill is to deprive of life. If, then, instead of voluntary manslaughter, we substitute its synonym and definition, we have *the unlawful and voluntary depriving a human being of life, without malice.* This is, in substance, and almost in words, what our legislation declares shall be manslaughter in the first degree.

The arguments drawn from the judicial construction, in other States, of the word *willful*, as employed in statutory murder, can exert no influence in the definition of voluntary manslaughter. *Willful* is not the synonym of voluntary. In truth, they express no distinct idea which is common to both. The former is a word of much greater strength than the latter. Willful, in this connection, denotes " governed by the will; without yielding to reason; obstinate; stubborn; perverse; inflexible." Voluntary, in this connection, means "willing; acting with willingness." It is the antithesis of involuntary. Voluntary manslaughter covers the whole ground of manslaughter, not occupied by involuntary manslaughter, which latter includes homicides that are the accidental result of some unlawful act, less than a felony. It is a perversion of language to say, that a force which is direct and unlawful, and which is intentionally aimed at a

particular person, and causes his death, or that the homi-
cide thus brought about, is involuntary.

Construing the charges given and refused in this case,
in the light of the testimony, we think the court did not
err.

[2.] The circuit court did not err in admitting evidence,
against the prisoner, of his acts, declarations and con-
duct, when he returned, a half-hour after the blow was
stricken, to the scene of the engagement. The indict-
ment was for murder, and such declarations and menacing
acts tended to show the hostile feelings of the accused
towards the deceased. Armed as he was with a deadly
weapon, and threatening to take the life of the man he
had, just before, assaulted with great violence, this, in
the absence of sufficient provocation, was a circum-
stance for the jury to weigh, in determining whether he
had not acted with a formed design to take life. It tended
to repel the idea, that the fatal blow had been struck in a
sudden transport of passion—pending the *furor brevis*—
which, in a proper case, will mitigate homicide to man-
slaughter.

It is to be lamented deeply, that death by violence has,
in this State, grown to be of such alarming frequency.
Scarcely a week passes that does not add its victim to the
long and frightful list of homicides. The fault is not in
the law. While its provisions are humane and just, they
are yet sufficiently strict, if duly administered, to punish
crime and restrain the lawless. The fault lies in a loose,
and falsely merciful administration of the law. Acquit-
tals, in prosecutions for homicide, have become so fre-
quent, that the criminal law has lost much of its terror.
In this way, misdirected sympathy for one malefactor
has, we fear, nerved and prompted the wicked to the de-
struction of many valuable lives. A just and humane
appreciation of the rights and perils of the accused,
should at all times pervade the jury-box; yet our sympa-
thy and solicitude should take a wider range. The lives
of others—the very repose and security of society, rest
on a wise system of penal laws, faithfully, yet humanely
administered.

A false opinion has, we fear, obtained extensive credence, that notions of chivalry, or personal prowess, can. lawfully enter into individual quarrels and combats. The humane doctrine of the common law, which, for the protection of human life, required the citizen to decline a combat, and to abstain from the shedding of blood, whenever he could do so, without endangering his person in the one case, and his life in the other, seems, in a great degree, to have been lost sight of.

We have discovered no disinclination to administer the law in its purity, when the killing was by stealth, by lying in wait, by poison, or for the sake of gain. When, however, life has been taken boldly, during a personal engagement, or in resentment of an assault or gross insult recently given, it is difficult to obtain a faithful administration of the law. Voluntary manslaughter, and even the most atrocious murder, may be, and frequently is committed, while the parties are engaged in personal combat.

Much of the waste and destruction of life, under which society is suffering, grows out of the pernicious practice, too prevalent among our citizens, even in the peaceful pursuits of life, of wearing deadly weapons upon their persons. Such deadly weapons are readily drawn, and fatally employed, in resentment of injuries and insults of the most trivial character. While the law secures the right to all to employ deadly weapons, even to the fatal result, in protection of life, or to save one's person from grievous bodily harm, as the law understands that term, we may well ask, why, in a peaceful community, do citizens wear arms, who have no just grounds to apprehend danger to their lives, or those *grievous personal injuries*, which will excuse a resort to deadly weapons? The law views as equally sacred the life of every citizen, no matter how humble or worthless he may be; and cannot hold him guiltless, who takes vengeance into his own hands, except there be a well grounded apprehension, at the time, of imminent danger to life or member, from which there is no other reasonable way of escape. An insult, or an assault, or an assault and battery, which does not endanger

life or member, furnishes no excuse for taking life. If the provocation be personal violence, which does not endanger life or member, and immediately afterwards, influenced and maddened by the injury, and without any formed design, the party stricken slay the other, and there be no evidence of previous malice, or intention to kill, then the law, out of respect to human infirmity, mitigates the offense to manslaughter. If, however, there was a previous specific intent to kill, and the assault was provoked or taken advantage of as a pretext for taking life, and such intention be carried out, this is murder. So, if a party be armed with a deadly weapon, or have such weapon within his reach, and have formed the general purpose to employ such weapon upon an exigency, such as an assault and battery upon him, not endangering life or member, and do so employ it, and thereby take life, pursuant to such previous design—this is a species of universal malice, and constitutes murder.

In the case of Rex v. Thomas, (7 C. & P. 817,) Baron Parker, in charging the jury, said: "If you find that, before the stroke is given, there is a determination to punish any man who gives a blow with such an instrument as the one which the prisoner used," [a sword cane,]—"because, if you are satisfied that, before the blow was given, the prisoner meant to give a wound with such an instrument, it is impossible to attribute the giving of such a wound to the passion of anger excited by that blow; for no man who was under proper feelings—none but a bad man of a wicked and cruel disposition, would really determine beforehand to resent a blow with such an instrument."—See, also, 2 Bishop's Criminal Law, section 643.

The law is so framed as to secure personal immunity to every citizen, and affords ample redress for all his injuries. Cases may arise, when, on provocation which falls below self-defense, life is taken, or attempted, by one who habitually wears arms, and when the proof fails to show just grounds to apprehend an attack. How far these circumstances should be considered in adjusting the degree of the offense, it is not proper we should here declare. We

leave this subject to be determined, when the subject comes directly before us.

Judgment affirmed.

A. J. WALKER, C. J., *dissenting.*