# McNeezer *v.* The State.

## *Indictment for Murder.*

1. *Confessions; when voluntary and admissible.*—Where the deceased was killed by being cut with a knife, during a sudden quarrel and fight between him and the defendant ; and a witness for the prosecution stated that, a short time after the difficulty, the defendant came up while witness was standing with one W. and another person, and being asked by W. "what he had done to Charlie" (meaning the deceased), said that he "had knocked him down with a stick"; that, on W. saying "he had done more than that," the defen‑ dant started off, but was pursued and overtaken by W., who thereupon arrested him, and left him in charge of witness and the man who was standing with him; and that while thus in their custody, no threats or promises being made by any one, the defendant said, "I have done what I never wanted to do, or intended to do : I cut Charlie's throat before he drew his knife"; *held*, that the confession was voluntary and admissible.

2. *Manslaughter; self-defense.*—The charges of the court to the jury in this case, as to the constituents of manslaughter in the first and second degrees, the deceased having been killed by the defendant with a knife, in a mutual fight growing out of a sudden quarrel, and the refusal of a charge asked as to

the right of self-defense, held free from error, under the former decisions of this court, and other authorities cited.

FROM the Circuit Court of Russell.

Tried before the Hon. WM. S. MUDD.

The indictment in this case charged the defendant, Marion McNeezer, with the murder of Charles Young, by cutting him with a knife; and on the trial, issue being joined on the plea of not guilty, he was convicted of manslaughter in the first degree, and sentenced to imprisonment in the penitentary for the term of ten years. The following bill of exceptions, which shows all the points here presented for revision, was duly reserved on the trial:

"The State introduced Doctor Norwood as a witness, and established by him that the deceased came to his death by a stab in the throat, in Russell county, on or about the 18th September, 1879. Jim Peck, a witness for the State, swore that, on the morning of the killing, the defendant came to where he and another hand and Mr. Williams were standing; and the State proposed to introduce the declarations of the defendant, made at that time. Thereupon, the court, for its own ear, proceeded to examine said witness, to ascertain the circumstances under which said confession was made. The witness stated to the court, that when defendant came up, Mr. Williams said, '*What have you done to Charlie?*' meaning the deceased; and defendant answered, '*I knocked him down with a stick.*' Williams said: '*No, you have done more than that.*" Defendant started off, and got about one hundred yards, when Williams pursued and overtook him, witness being at that time about forty or fifty yards off. Witness heard Williams say to defendant, '*I arrest you, and will leave you in charge of these men,*' meaning witness and the other hand above referred to, '*until I come back.*' When this was said, witness was still some distance in the rear of defendant and Williams. Witness stated, also, that he heard no threats or promises made, or inducements offered to the defendant by any body; thinks it was all that was said; that he heard all that was said, and the above is all that was said; that he and the other negro came up, and Williams left the defendant in their custody, and during the absence of Williams the confessions occurred which the State proposed to introduce. This was all the preliminary proof as to the admissibility of the confessions; and the defendant thereupon objected to proof being made of any confessions, because no sufficient predicate had been laid for the introduction of such proof, and because it was not shown that any such confessions were voluntary; but the court overruled the objection, and per-

mitted the witness to testify to the jury as to what was then said by the defendant, and the defendant excepted. Under this ruling of the court, the witness then proceeded to state, that the defendant, when Williams left, lay on the ground on his face, and said, '*I have done what I never wanted to do, or intended to do: I cut Charlie's throat before he drew his knife,*' Witness said, that defendant talked a good deal, both lying down, and standing up, but witness could recollect nothing more that he said; could not recollect whether he laid down once or five times, or any thing more that was said.

"Mr. Martin, then introduced as a witness for the State, testified, that he arrived at where Jim Peck and the other witness had defendant under guard; that defendant was talking when he got there, and said, that he cut deceased before he opened his knife—that he was joking deceased in a pleasant manner about a half-dollar, and had no idea that deceased was mad, when they got into a quarrel, and commenced fighting; that they hitched, and fought all around, and deceased was drawing his knife, when he (defendant) cut him, and then broke loose from him, and ran away. Defendant said more, but witness paid but little attention, and did not remember it. It was in proof, also, that the ground around where the *defendant* (?) was lying was much trampled, and bore evidence of a severe struggle for ten feet around. Two persons got to the deceased before he died; one, Mr. Martin, did not notice him; the other, defendant's father, found a knife tightly grasped in his right hand, open. This was about sun-rise. The fight occurred between daybreak and sun-rise. Doctor Norwood, being recalled, testified as to seeing the knife in the hand of the deceased. There was proof showing that the deceased and the defendant had always been on very friendly terms, visited each other very often, stayed together the night before, and had started off together, a few minutes before the difficulty occurred, in the most friendly manner. There was proof, also, showing that the defendant's coat was cut with a knife, just below the left arm; which cut was discovered a few hours after the killing. There was, also, proof tending to show that defendant was preparing to leave the country.

"This was all the evidence in the case; and the court thereupon charged the jury, that if they believed that, in Russell county, and twelve months before the finding of the indictment, the deceased and the defendant being friendly, just before the killing, defendant began to joke the deceased about a half-dollar, and they got into a quarrel, and then into a fight, and both had drawn their knives, and defendant

[McNeezer v. The State.]

cut and killed the deceased, then the defendant can not be guiltless."

"The court further charged the jury, that if they believed the deceased and the defendant had always been friendly, and got into a quarrel first, joking about a half-dollar, and afterwards into a fight; and the blood of both being heated, both drew their knives, and in the heat of passion, and during the conflict, defendant intentionally cut and killed the deceased; under this state of facts, the defendant is guilty of manslaughter in the first degree.

"The court further charged the jury, that if the defendant unlawfully and intentionally cut the deceased, and killed him, but did not intend to kill him, then the question of manslaughter in the second degree can not arise."

The defendant excepted to each of these charges, and then requested the court to instruct the jury as follows: "If the circumstances were such as to induce the defendant to believe that the deceased was about to attack him with a knife he was then drawing, with the intention and ability to kill him, and, being impressed with the *fact* (?) that his life was in imminent peril, he struck a single blow with his knife, which killed the deceased; then he would not be guilty, even if in fact defendant was not in such peril." The court refused to give this charge, and the defendant excepted to its refusal.

No counsel appeared in this court for the defendant, so far as the record and dockets show; and there is no brief on file.

H. C. TOMPKINS, Attorney-General, for the State.

STONE, J.—We find no error in this record. It was shown that the prisoner's confessions were voluntarily made, and that neither threats nor promises were made to him, to induce him to confess. The case is brought strictly within the rule.—1 Brick. Dig. 509, §§ 859, 864, 868. The charges given were strictly in accordance with the well-settled rules of law.—1 Bish. Cr. Law, 6th ed., sections 869, 870; *McManus v. The State*, 36 Ala. 285; *Oates v. The State*, 50 Ala. 166; *Lewis v. The State*, 51 Ala. 1; *Eiland v. The State*, 52 Ala. 322; *Evans v. The State*, 44 Miss. 762; *Hill's case*, 4 Dev. & Bat. 491. In *Vaiden v. Com.*, 12 Grat. 717–730, the court said, "A man shall not, in any case, justify the killing of another by a pretense of necessity, unless he were without fault in bringing that necessity upon himself."

The record contains no testimony tending in the slightest degree to show that the deceased was about to attack the ac-

[Armor v. The State.]

cused with a knife. They were engaged in a conflict, which appears to have been mutually entered upon. For the error above, if for no other, the charge was rightly refused. 1 Brick. Dig. 338, § 41.

The judgment of the court below is affirmed.