STATE, Appellant, v. COLLOVA, Respondent.

*No. 75–480. Submitted on briefs May 4, 1977.—*
*Decided July 1, 1977.*
(Also reported in 255 N. W. 2d 581.)

474

For the appellant the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Albert O. Harriman,* assistant attorney general.

For the respondent the cause was submitted on the brief of *J. Michael End* and *Gray & Barden, S. C.* of Milwaukee, attorneys for respondent and for The Wisconsin Civil Liberties Union Foundation, Inc.

ABRAHAMSON, J.   Carmelo F. Collova, by reason of a prior revocation of his privilege to operate a motor

vehicle, was required to file and maintain with the Department of Transportation, Division of Motor Vehicles, proof of financial responsibility through September 12, 1975. Collova complied with this requirement by the filing of a certificate of insurance as provided in sec. 344.31, Stats. However, on November 1, 1974, the Division of Motor Vehicles mailed a notice to Collova advising him that his insurance certificate would terminate on November 10, 1974 and informing him that unless financial proof was renewed on or before that date his operating privilege would be revoked. Printed on the same form was an "Order of Revocation" providing as follows:

"In the event of your failure to furnish the department with renewed proof of your financial responsibility on or before the effective date of this order your operating privilege will be revoked and all licenses evidencing such privilege must be immediately surrendered to the Administrator of Motor Vehicles at his office in the Hill Farms State Office Building, Madison, Wisconsin.

"This order of revocation is issued in accordance with Section 344.40 of the Wisconsin Statutes. Effective date of this revocation order is November 10, 1974

"Dated at Madison, Wisconsin November 1, 1974"

On December 1, 1974, Collova, while driving an automobile in Portage county, Wisconsin, was stopped by an officer of the State Highway Patrol and was charged with operating a motor vehicle after revocation of his operating privilege in violation of sec. 343.44(1), Stats.

Sec. 343.44, Stats., provides in part:

"(1) No person whose operating privilege has been duly revoked or suspended pursuant to the laws of this state shall operate a motor vehicle upon any highway in this state during such suspension or revocation or thereafter before filing proof of financial responsibility or before he has obtained a new license in this state or his operating privilege has been reinstated under the laws of this state. . . .

"(2) Any person violating this section may be fined not less than $100 nor more than $400 and shall be im-

prisoned not less than 10 days nor more than one year in the county jail . . . . Refusal to accept or failure to receive an order of revocation or suspension mailed by 1st class mail to such person's last-known address shall not be a defense to the charge of driving after revocation or suspension. If such person has changed his address and fails to notify the division as required in s. 343.22 then failure to receive notice of revocation or suspension shall not be a defense to the charge of driving after revocation or suspension."

After entering a plea of not guilty, the defendant moved to dismiss the charges against him on the ground that the statute under which he was charged was constitutionally defective.

For purposes of the motion the following facts were stipulated by the parties:

1. Collova was driving an automobile on December 1, 1974;

2. Collova was subject to the provisions of the financial responsibility law on that date;

3. Collova did not have automobile insurance on file;

4. The Notice of Cancellation and Order of Revocation of Collova's operating privileges was mailed by the Division of Motor Vehicles to Collova by first-class mail on November 1, 1974;

5. Collova claims he did not receive the notice of revocation.

6. Collova claims he had insurance but it was not filed with Madison (Division of Motor Vehicles).[1]

Collova's motion to dismiss was granted by the Portage County Court on August 15, 1975, and by decision of September 25, 1975 the circuit court affirmed. The State has appealed from this judgment.

---

[1] This statement appears in the stipulation in the record and in the State's brief. The judgment of the county court and the decision of the circuit court on appeal state however that the parties stipulated the automobile insurance had lapsed.

## I.

Collova contends that sub. (2) of the statute is ambiguous as to whether failure to receive first-class mail notice is a defense. He further contends that because this is a penal statute the ambiguity should be resolved against the state and that the statute should be construed to allow assertion of non-receipt of such notice as a complete defense.

It may be admitted that the statute is not felicitously worded. However, we do not think the construction urged by Collova is correct. Prior to its being amended to its present form by sec. 504, ch. 90, Laws of 1973, the statute read:

"(2) . . . If the revocation or suspension is pursuant to s. 343.32, 343.34, 344.08, 344.14 or 344.25 the penalties shall not apply until the person whose license has been revoked or suspended has received actual notice of such revocation or suspension or until 5 days following the delivery of such notice to the person or an adult at his address by mail as shown by return receipt. If such person has changed his address and fails to notify the division as required in s. 343.22 then failure to receive notice of revocation or suspension shall not be a defense to the charge of driving after revocation or suspension."

The first sentence of sub. (2) quoted immediately above was applicable when the driver's correct address was on file with the division. Penalties did not apply until actual notice was received or until five days following delivery of notice by certified mail as shown by return receipt. The second sentence was applicable when the driver failed to notify the division of a change in his address, in which event his failure to receive notice was not a defense. The 1973 amendment obviously was intended to change the method of giving notice from certified mail to first-class mail and to provide that if

such notice is in fact mailed to the defendant's last-known address, non-receipt or refusal to accept is not a defense. The second sentence may well be unnecessary now, as the State appears to concede, but this does not create an ambiguity, and avoidance of superfluity as to the second sentence is not a sufficient reason to directly violate the obvious intent of the 1973 amendment. Moreover, it is arguable that the second sentence is not in fact superfluous. Though we do not so decide, taken literally the second sentence might be read to mean that if the defendant has failed to inform the department of a change of address, lack of notice is not a defense even if the division failed to send out any notification at all. The defendant's suggested construction must be rejected. The statute states clearly that non-receipt of an order of revocation properly mailed is not a defense to a charge under the statute.

## II.

We do not believe it follows, however, that because nonreceipt of mailed notice is not a defense, the defendant's state of mind, whether called mens rea, criminal intent, guilty knowledge or scienter, is immaterial to the existence of an offense under the statute. Sec. 343.44(2), Stats., is very narrowly worded:

"Refusal to accept or failure to receive an order of revocation or suspension mailed by 1st class mail to such person's last-known address shall not be a defense . . . ."

Sub. (2) of the statute is drawn with conspicuous narrowness to provide no more than that a defendant may not defeat the prosecution merely by showing that he did not receive or refused to accept a notification of revocation sent by first-class mail to his last known home

address. Thus the definition of the offense here involved does not contain any express words requiring or negativing any particular mental element, or requiring or negativing any specific state of mind. Legislative silence on whether *scienter* is an element of the offense is not unusual in criminal statutes,[2] and the courts have been left the task of ascertaining the legislative intent from the nature of the particular statute involved. *United States v. Balint,* 258 U.S. 250, 252, 42 S. Ct. 301, 66 L. Ed. 604 (1922) ; *Morissette v. United States,* 342 U.S. 246, 251, 72 S. Ct. 240, 96 L. Ed. 288 (1952) ; *United States v. Renner,* 496 F.2d 922, 924 (6th Cir. 1974).

In *State v. Alfonsi,* 33 Wis.2d 469, 476, 147 N.W.2d 550 (1960), this court observed that "the element of scienter is the rule rather than the exception in our criminal jurisprudence." However, the court has long recognized the existence of and, as a general matter, the propriety of legislative definitions of crime that omit any element respecting mental state beyond the requirement that the accused intended to do the act which is made a crime. In *State v. Hartfiel,* 24 Wis. 60 (1869), the court affirmed the conviction of a tavern operator for selling liquor to a minor notwithstanding that the minor was over six feet tall and had informed the proprietor that he was of age. The court said:

[2] Professor Frank Remington of the University of Wisconsin School of Law has commented on the pre-1955 criminal laws that "[t]he dominant characteristic of the criminal statutes of Wisconsin is their ambiguity on the issue of the requirement of fault." Remington, *Liability Without Fault Criminal Statutes,* 1956 Wis. L. Rev. 625.

Sec. 939.23, Stats., provides rules for statutory construction "when criminal intent is an element of a crime in the criminal code [Title XLV, Stats.]." The crime charged here is not part of the criminal code. It is defined in ch. 343 of Title XXXII, entitled Vehicle Code.

"The authorities cited are to the effect that, where a statute commands that an act be done or omitted, which, in the absence of such statute, might have been done or omitted without culpability, ignorance of the fact, or state of things contemplated by the statute, will not excuse its violation.

". . . [W]e have no doubt that the legislature intended to inflict the penalty, irrespective of the knowledge or motives of the person who has violated its provisions. Indeed, if this were not so, it is plain that the statute might be violated times without number, with no possibility of convicting offenders, and so it would become a dead letter on the statute book, and the evil aimed at by the legislature remain almost wholly untouched. To guard against such results, the legislature has, in effect, provided that the saloon keeper, or other vendor of intoxicating liquors or drinks, must know the facts—must know that the person to whom he sells is a *qualified drinker*, within the meaning of the statute; and, if not, he acts at his peril in disobeying the requirements of the law."

In *State v. Dried Milk Products Co-op.*, 16 Wis.2d 357, 362, 114 N.W.2d 412 (1962), this court upheld the constitutionality of imposing a $400 fine on the corporate owner of a truck which had been loaded in excess of axle weight limitations, in spite of the absence of any actual knowledge of the violation on the owner's part. The court described the purpose of such enactments as being the enforcement of a high standard of care:

"Statutes of this nature, imposing criminal penalty irrespective of any intent to violate them, have for their purpose the requirement of a degree of diligence for the protection of the public which shall render violation thereof impossible. . . . These statutes are examples of situations where a person must at his peril see to it that the regulations are not violated by his acts or by the acts of another acting on his behalf."[3]

---

[3] *See also City of West Allis v. Megna*, 26 Wis.2d 545, 548, 133 N.W.2d 252 (1963).

The problem is determining where the legislature intended to draw the line between offenses which do and do not require scienter. Liability without fault has been applied in Wisconsin, as the above cited cases demonstrate, in "regulatory criminal statutes." The complex industrial state of the 20th century has generated increased social regulation and has adapted the criminal law, originally designed to punish the culpable individual, to enforce obedience to regulatory statutes. These regulatory statutes are concerned primarily with the protection of social and public interests, with the prevention of direct and widespread social injury. They are more concerned with the injurious conduct than with the question of individual guilt or moral culpability. The penalties imposed are generally light. The usual rationale for strict liability statutes is that the public interest is so great as to warrant the imposition of an absolute standard of care—the defendant can have no excuse for disobeying the law. Because of the multitude of cases arising under these regulatory statutes, there is a need for quick, simple trials unhindered by examinations of the subjective intent of each defendant.

The United States Supreme Court has discussed the development of regulatory criminal statutes imposing liability without fault as follows:

"The industrial revolution multiplied the number of workmen exposed to injury from increasingly powerful and complex mechanisms, driven by freshly discovered sources of energy, requiring higher precautions by employers. Traffic of velocities, volumes and varieties unheard of came to subject the wayfarer to intolerable casualty risks if owners and drivers were not to observe new cares and uniformities of conduct. Congestion of cities and crowding of quarters called for health and welfare regulations undreamed of in simpler times. Wide distribution of goods became an instrument of wide distribution of harm when those who dispersed food, drink, drugs, and even securities, did not comply with reason-

able standards of quality, integrity, disclosure and care. Such dangers have engendered increasingly numerous and detailed regulations which heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare.

"While many of these duties are sanctioned by a more strict civil liability, lawmakers, whether wisely or not, have sought to make such regulations more effective by invoking criminal sanctions to be applied by the familiar technique of criminal prosecutions and convictions. This has confronted the courts with a multitude of prosecutions, based on statutes or administrative regulations, for what have been aptly called 'public welfare offenses.' These cases do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone

makes out the crime. This has not, however, been without expression of misgiving."[4]

Several factors are present in the case at bar that suggest scienter be disregarded. The offense is obviously a police regulation designed to function with the rest of the motor vehicle laws in regulating the social order. Revocation of drivers' licenses is a significant sanction in enforcing obedience to traffic laws generally, and if the state were to lose effective control over the privilege of operating motor vehicles, the rate of injury on the highways might very well rise. The seriousness of harm to the public resulting from unlicensed drivers is generally conceded.

Strict criminal liability has been imposed on persons who failed to have a license or to comply with regulations when trafficking in drugs or in firearms. *United States v. Freed*, 401 U.S. 601, 91 S. Ct. 1112, 28 L. Ed.2d 356 (1971) ; *United States v. Balint*, 258 U.S. 250, 42 S. Ct. 301, 66 L. Ed. 604 (1922). But such acts are in and of themselves not innocent acts. Persons who choose to engage in these kinds of unusual and dangerous activities may reasonably be held to the highest standards of care and precision, enforced by strict criminal liability, in conforming to government regulations. But driving a car, though dangerous if improperly done, is a usual,

---

[4] *Morissette v. United States*, 342 U.S. 246, 253–256, 72 S. Ct. 240, 96 L. Ed. 288 (1952).

For a discussion of strict liability and criminal offenses, *see* Hall, *General Principles of Criminal Law*, c. X (2d ed. 1960); *Perkins on Criminal Law*, 799–809 (2d ed. 1969); LaFave & Scott, *Criminal Law*, 218–223 (1972); Sayre, *Public Welfare Offenses*, 33 Colum. L. Rev. 55 (1933); Mueller, *On Common Law Mens Rea*, 42 Minn. L. Rev. 1043 (1958); Hart, *The Aims of the Criminal Law*, 23 Law & Contemp. Prob. 401 (1958); Harring, *Liability Without Fault: Logic & Potential of a Developing Concept*, 1970 Wis. L. Rev. 1201.

everyday lawful occurrence for a very large segment of our society, and obtaining a driver's license is a common and simple procedure.

As pointed out in the *Dried Milk Co-operative Case,* the usual purpose of strict liability offenses is the enforcement of a high standard of care for the protection of the public. Such offenses are most commonly found in areas such as food and drug handling and sale, the sale of intoxicating liquors to minors, traffic law violations, and sales of misbranded articles.[5] In cases such as these it can be said that if sufficient care is exercised the proscribed conduct can be avoided in all but the exceptional instance. The persons to whom the regulations are directed are generally in a position to exercise such high degree of care; they will be encouraged to do so by the imposition of strict penal liability, and the penalties usually involved are such as to make the occasional punishment of one who has done everything that could have been done to avoid the violation a reasonable price to pay for the public benefit of the high standard of care that has been induced. Thus where the statute is not explicit, one of the principle indexes courts consider on the question whether some element of knowledge is required is the severity of the penalty involved.

We think the severe consequences attached to a violation of sec. 343.44, Stats., to be the dispositive factor here. An offense under the statute is a misdemeanor and, in terms of the severity of its penalties, a serious one. If convicted, a defendant *must* be sentenced to at least ten days in county jail and may be sentenced to as long as a one-year term; the defendant may, in addi-

---

[5] "The better view is that strict liability should never be relied upon to impose a sentence of imprisonment and the moral condemnation which goes with it . . . ." LaFave & Scott, *Criminal Law,* sec. 31, p. 218 (1972).

tion, be fined from $100 to $400. A jail sentence of at least ten days is mandatory—probation may not be imposed instead. *State v. Duffy,* 54 Wis.2d 61, 194 N.W.2d 624 (1972). Moreover, in addition to the criminal penalties involved, upon conviction of an offense under sec. 343.44 the Division of Motor Vehicles is required to revoke the defendant's operating privileges for a period of one year. Sec. 343.31(1) (f) and (3), Stats.

We do not believe the legislature intended to impose such a severe penalty without some requirement of guilty knowledge as an element of the offense.[6] The inquiry, reduced to its simplest terms, may be stated to be whether the statute appears on balance to be designed to punish wrongdoers or to implement a high standard of care on the part of the public. It cannot be doubted that the latter purpose is present here, and this purpose must be considered in construing the statute. However, we think it clear in light of the severity of the penalty involved, that the statute is in large measure designed to punish those who have culpably done that which the legislature has declared to be wrongful. The driving of a motor vehicle by one who has neither knowledge nor reason to know that his operating privilege is or may have been revoked is a wholly routine and innocent act. Absent some unmistakable indication in the words of the statute, we are unwilling to conclude that the legislature intended to subject a defendant who is innocent of any negligent or intentional wrongdoing to the harsh consequences a conviction under sec. 343.44 entails. To inflict substantial punishment on a person who is innocent of any intentional or negligent wrongdoing offends the sense of justice and is ineffective. Nor does it make sense to label him as a socially dangerous individual who needs to be incapacitated or reformed.[7]

---

[6] Sayre, note 4, *supra,* at 73.

[7] *See* authorities cited at note 4, *supra.*

We believe that the legislature intended in sec. 343.44 to impose on drivers not strict criminal liability, but a high objective standard of care.[8] We believe the legislature intended to include as an element of the offense under sec. 343.44 that the defendant has cause to believe that his driver's license might be revoked or suspended. A defendant has cause to believe his license might be revoked or suspended when:

(1) He has knowledge of the revocation or suspension; or

(2) He has received notification of the revocation or suspension;[9] or

(3) He has knowledge of, or a reasonable person in the defendant's situation, exercising reasonable diligence, would have knowledge of, the existence of facts or circumstances which, under Wisconsin law, might cause the revocation or suspension.[10]

We believe this construction of the statute is consistent with both the injustice of imposing severe criminal liability on a person who is not culpable, and the need of

---

[8] Objective liability is imposed in secs. 940.08 and 940.09, Stats., relating to death by operation of a vehicle.

[9] In this regard the state may avail itself of the permissible inference that a letter properly posted was received. *See Greene v. Donner,* 198 Wis. 122, 126, 223 N.W. 427 (1929); secs. 903.01, 903.03, Stats. The defendant may introduce testimony or other evidence to contradict the inference that notification was received; while under the statute non-receipt of notification is not in itself a defense, it is relevant on the question whether the defendant had cause to believe his license had been suspended or revoked.

[10] Where notification of revocation has been mailed to the defendant but delivery has been evaded or refused, non-receipt of notice occasioned by the defendant's own act is of course inconsistent with the exercise of due diligence in respect to his knowledge of facts relating to the status of his driving privilege. *Cf. Boeck v. State Hwy. Comm.,* 36 Wis.2d 440, 446, 447, 153 N.W.2d 610 (1967).

imposing a positive and high duty of care on each individual to protect the public interest.

The defendant's ignorance of the law or negligence as to the existence of the law is not a defense.[11] Thus the defendant's failure to know that driving without a license is a crime is not a defense. Also, the defendant's failure to know which facts or circumstances may subject him to revocation or suspension of his driver's license under Wisconsin law is not a defense.

Under sec. 343.44, Stats., the state must prove in this case that (1) the defendant's license was duly revoked or suspended pursuant to the laws of the state; (2) the division sent a notice of revocation or suspension to the defendant, by first-class mail at the least, to his last known address; (3) the defendant was operating a motor vehicle upon a highway in the state during such revocation or suspension; and (4) the defendant had cause to believe his license might be revoked or suspended.

In the case at bar the defendant's license was subject to revocation if he did not have automobile insurance on file with the division. The state might therefore prove the defendant had cause to believe his license might be revoked or suspended by showing that the defendant knew or had reason to know that his insurance was terminated and would not be on file because, *e.g.*, he was advised by his insurer that his insurance was terminated (sec. 631.36, Stats. 1975), or he had violated a provision in the policy which would cause termination of the policy or he had failed to pay premiums thus causing a termination of the policy.

Since we hold that the statute does require the state to prove negligent or intentional culpability as an ele-

---

[11] For a discussion of reasonable mistake of or ignorance of the law as a defense, *see United States v. Barker*, 514 F.2d 208, 227 (D.C. 1975) (concurring opinion).

ment of the offense, we do not reach the constitutional question addressed by the trial courts, namely, whether sec. 343.44, Stats., would violate due process if the statute imposed liability regardless of fault where only first-class mail notice was sent to a defendant and failure to receive the notice was not a defense.[12]

Accordingly, we conclude that the circuit court erred in affirming the county court's granting the defendant's motion to dismiss the charge, and we remand the case for trial consistent with the construction of sec. 343.44, Stats., set forth in this opinion.

*By the Court.*—Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.

CONNOR T. HANSEN, J. *(concurring in part; dissenting in part).* I concur with the result reached by the majority. The case should be reversed and the cause remanded. However, I respectfully dissent from and disagree with the rationale used by the majority in reaching that result. They have, in effect, added a fourth element to the otherwise clear and unambiguous language of sec. 343.44(2), Stats.

The majority correctly notes that the 1973 amendment to sec. 343.44(2), Stats., changed the method of giving notice from certified mail to first-class mail and provided that if such notice is in fact mailed to the defendant's last known address, non-receipt or refusal to accept is not a defense. The majority states, "The statute states

---

[12] Nor are we concerned here with the issue of whether the legislature could impose the burden on the defendant to show that he had no knowledge or probability of knowledge. *See In re Winship,* 397 U.S. 358 (1970); *Mullaney v. Wilbur,* 421 U.S. 684 (1975); *Patterson v. New York,* 429 U.S. 813, 97 S. Ct. 52, 50 L. Ed.2d 72 (1976); Note, *Affirmative Defenses & Due Process: The Constitutionality of Placing a Burden of Persuasion on a Criminal Defendant,* 64 Geo. L.J. 871 (1976).

clearly that non-receipt of an order of revocation properly mailed is not a defense to a charge under the statute."

The majority nevertheless proceeds to interpret the statute so as to create an additional or fourth element and to make non-receipt of the notice a complete or at least a partial defense. The majority does so by holding that an offense under sec. 343.44 (2), Stats., requires a finding of *mens rea,* original intent, guilty knowledge or scienter on the part of the defendant.

If the state is required to prove as an element of the offense that the defendant had cause to believe his license might be revoked or suspended, under the majority decision the state could presumably do so by proving that the defendant received notification of the revocation or suspension. In this regard, notes the majority, the state could avail itself of the presumption that a letter properly posted was received. A letter, mailed first-class to the defendant's last known address, is accorded under sec. 343.44 (2), Stats., more than a presumption of receipt, however. An irrebuttable presumption of receipt arises, because the non-receipt is no defense. It is that statutorily created irrebuttable presumption which the majority opinion negatives by this decision.

The statutory language and intent are clear. Non-receipt of a properly addressed first-class mailed notice is no defense. By adding the fourth element to the offense, the majority subverts the clear intent of the statute.

I am authorized to state that Mr. Justice HANLEY and Mr. Justice R. W. HANSEN join in this concurring in part; dissenting in part opinion.