MILWAUKEE CORRUGATING COMPANY and another, Appellants, vs. INDUSTRIAL COMMISSION OF WISCONSIN and another, Respondents.

*November 9—December 4, 1928.*

For the appellants there was a brief by *Quarles, Spence & Quarles,* attorneys, and *Arthur B. Doe,* of counsel, all of Milwaukee, and oral argument by *Mr. Doe.*

For the respondent Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

DOERFLER, J.    Sec. 102.09, sub. (5), par. (h), Stats. 1925, provides:

"Where injury is caused by the failure of the employer to comply with any statute of the state or any lawful order of

the industrial commission, compensation and death benefits as provided in sections 102.03 to 102.34, inclusive, shall be increased fifteen per cent."

Order No. 27 of General Orders on Safety provides:

*"Order 27—Drop hammers.* All drop hammers used on work which requires the operator to place his hand beneath the hammer when he places the part in position, must be guarded."

In the General Orders on Safety the commission has defined the term "guarded" as follows: "So covered, fenced, or inclosed that a person in the course of his employment is not liable to come in contact with the point of danger and be injured." In the files returned to this court there appears a blue-print of an alleged guard, known as a basket guard. This blue-print is a mere fugitive paper and cannot be considered by this court. It is not an exhibit received in evidence. The learned attorney general frankly admitted that the blue-print was not properly a part of the record, and claimed that it was merely used in the court below and that it was intended that the same be used in this court solely for illustrative purposes. The record, however, is totally barren of any evidence showing that a guard like that indicated by the blue-print had ever been invented, or that it was in use in connection with drop hammers in any industry. Furthermore, it does not appear that the Corrugating Company, prior to the happening of the accident, had any knowledge whatsoever of the existence of such an alleged guard, and no claim whatever had been made that either the members of the Industrial Commission or any one who represented such commission, as an inspector or otherwise, ever called the attention of the employer to the existence of such a guard, or to the necessity of using such an instrumentality in the operation of a drop hammer for the prevention of injuries. Assuming that a guard like the basket guard had been invented and was for sale upon the market at the time of the

accident, it further must appear affirmatively that such guard when installed in connection with a drop hammer is practicable; that is to say, that its use does not unreasonably interfere with the practical operations of the machine. No testimony on the practicability of such a guard, or any other guard excepting the strap device (if it may be considered a guard), was introduced.

This extra fifteen per cent. or increased compensation is in the nature of a penalty, and before it can be awarded it must appear that a guard like that referred to in the blueprint, or some other guard, had been invented, was available in the market, and was practicable. It is not sufficient to say that the members of the Industrial Commission are experts; that they have knowledge stored away which the ordinary person does not possess; and that they are at liberty to use such knowledge, even though the fact of its existence has never been before communicated to the employer. It is true that in the case of *McCarthy v. Sawyer-Goodman Co.* 194 Wis. 198, 215 N. W. 824, it is said, in connection with a case involving an alleged traumatic hernia: "It is scarcely too much to say that they [the members of the Industrial Commission] are experts upon the subject." Continuing, the opinion says:

"At any rate, none can deny that they are far better qualified to draw proper inferences from the physical facts than those who do not possess the peculiar knowledge of the subject which they have acquired by reason of their experience. . . ."

In another portion of the opinion it is said:

"The frequency of these cases has enabled the members of the Industrial Commission to become thoroughly familiar with the nature, development, and progress of the ailment, and they bring to the consideration of such cases a knowledge and experience which enables them to pass most discriminatingly upon the evidence produced."

What was said in the opinion in the *McCarthy Case* with respect to the use by the commissioners of their expert knowledge refers to their ability, by reason of such knowledge, to weigh the testimony of medical experts, to discriminate as to where the truth lies, and to draw proper inferences.

Where the sole knowledge of the existence of a guard is possessed by the commission, manifest injustice would be done to penalize an employer for not using such a guard. Furthermore, great injustice would result to an employer if he were penalized for failing to install a guard where it does not even appear in the evidence that the use of such guard is practicable. It is the privilege of the employer when charged with the violation of a statute or of an order of the Industrial Commission, in that he failed to install or use a guard, to defend on the theory that the proposed guard is impracticable. These and other necessary prerequisites must first be established before an employer can be penalized.

The safety device above referred to, consisting of the strap guard, had been in use for a considerable period of time in the factory of the company, and nowhere in the evidence does it appear that the company had ever been criticised for using such device instead of a guard. In the course of the administration of the workmen's compensation law it becomes incumbent upon the commission and those serving under it to periodically inspect the industries of the state, so that it must be assumed that the members of the commission and those serving it as inspectors or otherwise were fully advised and informed of the use by the company of this particular safety device and of its failure to have installed and used a guard as defined by the commission. There is not a scintilla of evidence in the record from which it can even be inferred that the attention of the company had been called to its failure to install a statutory guard, or that its attention had been called to an existing guard which is practicable, available, and which complies with the definition of

"guard" as above outlined. Inspector Frister, who was fully informed of the device used by the company, while a witness on the stand testified in effect that this device was as efficient as anything that he knew of. Furthermore, the efficiency of the strap guard was nowhere even questioned. Under these circumstances there is only one logical inference deducible, viz. that the device consisting of the harness was considered by the commission ample for the purpose for which a guard is ordinarily required, and that the service which it performed was equivalent to any other instrumentality used for protective purposes which was available.

For these reasons we conclude that the showing made by the claimant was not sufficient to warrant the conclusions arrived at by the commission as the result of which the extra compensation of fifteen per cent. was awarded.

Sub. (5), par. (i), (j), and (k) of sec. 102.09, Stats. 1925, provides:

"(i) Where injury is caused by the wilful failure of the employee to use safety devices where provided by the employer, or

"(j) Where injury results from the employee's wilful failure to obey any reasonable rule adopted by the employer for the safety of the employee, or

"(k) Where injury results from the intoxication of the employee, the compensation, and death benefit provided herein shall be reduced fifteen per cent."

Plaintiff argues that the failure to use the safety device furnished by the employer, in view of the instructions given to the claimant and the rule of the company, constituted a wilful failure, and that therefore the compensation should have been reduced by fifteen per cent.

In *State v. Preston,* 34 Wis. 675, 684, the court in its opinion approved the following quotation from *McManus v. State,* 36 Ala. 285:

" 'Wilful is not the synonym of voluntary. In truth, they express no idea which is common to both. The former is a word of much greater strength than the latter. Wilful, in

this connection, denotes "governed by the will; without yielding to reason; obstinate; stubborn; perverse; inflexible." Voluntary, in this connection, means "willing; acting with willingness." It is the antithesis of involuntary.'"

In 40 Cyc. 938, the word "wilful" is defined as follows:

"The words 'wilful' and wilfully' are of somewhat varied signification according to the context in which they are used in particular cases and the nature of the subject under discussion or treatment. They are frequently used in the sense of intentionally, or in other words as implying a purpose or design, or proceeding from a conscious motion of the will as distinguished from accidentally or involuntarily; and they are accordingly used in the sense of or as equivalent to willingly; designedly; purposely; obstinately; stubbornly; inflexibly; perversely; voluntarily; deliberately; with set purpose; being governed by the will, without regard to reason, or without yielding to reason. . . ."

The operators frequently discarded the device because its use produced discomfort and interfered with the dispatch of the work. While ordinarily the foreman reprimanded the operators when they failed to use the harness, there were times when cautions and reprimands were not forthcoming. The failure to comply with the instructions and rule was not confined to the claimant, but to all of the other operators, so that it might be said that the observation of the rule was less common than its violation. No operator had ever been discharged for violating the rule of the company. Such a situation amounts practically to a tacit consent on the part of the employer, and under such circumstances the failure to use the harness can hardly be deemed to be wilful, in the sense in which it is used in sec. 102.09 of the Statutes. As we view it, the term "wilful" as used denotes obstinacy, stubbornness, and perverseness. The failure to use the device was not in the nature of a defiance of the rule of the company, but because its use was connected with discomfort, and because it interfered with the operators' dispatch of

duties, and because, notwithstanding the reprimands, the failure to use the device was tolerated.

*By the Court.*—That part of the judgment of the lower court providing for a fifteen per cent. additional compensation is reversed; that portion refusing a reduction of fifteen per cent. of the award is affirmed, and the cause is remanded with directions to enter judgment in accordance with this opinion. No costs are allowed to either party, the plaintiff, however, to pay the clerk's fees.