DEPARTMENT OF TRANSPORTATION, State of Wisconsin, Petitioner-Respondent,

WISCONSIN AUTOMOBILE & TRUCK DEALERS ASSOCIATION, INC., Intervenor-Appellant,†

v.

TRANSPORTATION COMMISSION of State of Wisconsin, Respondent,

Francis C. WILSON, Intervenor-Respondent.

Court of Appeals

No. 81–596. *Submitted on briefs October 28, 1981.— Decided December 22, 1981.* (Also reported in 315 N.W.2d 371.)

† Petition to review granted. DAY, J., took no part.

For the intervenor-appellant the cause was submitted on the brief of *Paul R. Norman* of *Wheeler, Van Sickle, Anderson, Norman & Harvey, S.C.,* of Madison.

For the petitioner-respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *William C. Wolford,* assistant attorney general.

Before Voss, P.J., Brown and Scott, JJ.

BROWN, J. This is an appeal from an order affirming a finding of the Transportation Commission which found a violation of sec. 218.01(3)(a)18, Stats., and directing it to make a finding of a violation of sec. 218.01 (3)(a)6, Stats. This case involves a sale of a diesel automobile by Doucas Olds to a retail buyer. Doucas Olds attempted to change the terms of the sales agreement after discovering what was apparently a good faith mistake in its original pricing. Because we find that there need be no fraudulent or malicious intent in these statutory provisions which prevent a motor vehicle dealer from changing the terms of a written sales agreement with a retail buyer, we affirm the trial court's order.

In October 1977, Francis Wilson sought to buy two diesel automobiles from Doucas Olds. He negotiated with a salesman and struck a deal. Two purchase contracts were written up, neither of which included the price for the diesel engine option. That this was an accidental, good faith oversight is not in dispute. Upon discovering the error, Doucas Olds contacted Wilson and sought either to increase the price so as to include the cost of the diesel option or to cancel the orders. Wilson did not choose to cancel and subsequently demanded the autos at the originally quoted price, which Doucas Olds was apparently loathe to do.[1]

The Department of Transportation (DOT) filed a complaint against Doucas Olds (dealer) with the Transportation Commission (commission) alleging violation of sec. 218.01(3)(a)6 and 18, Stats.:

(3) LICENSES, HOW DENIED, SUSPENDED OR REVOKED. (a) A license may be denied, suspended or revoked on the following grounds:
. . . .

---

[1] Ultimately, after suit was brought, Doucas Olds and Wilson reached a negotiated price for the autos.

6. Wilful failure to perform any written agreement with any retail buyer.

. . . .

18. Having accepted an order of purchase or a contract from a buyer if such arrangement results in the practice of bushing. For the purpose of this section, "bushing" means the practice of increasing the selling price of a motor vehicle above that originally quoted the purchaser as evidenced by a purchase order or contract which has been signed by both the purchaser and dealer licensee.

Some months later, the Wisconsin Automobile and Truck Dealers Association, Inc. (WATDA) was granted leave by the commission to intervene as a party.

The commission held hearings and dismissed the complaint. The DOT petitioned the circuit court for review. Reserve Judge George Currie found that the commission's interpretation of sec. 218.01(3)(a)6, Stats., as penal was error and directed the commission to redetermine the meaning of the word, "wilful," in a nonpenal light and to further interpret sec. 218.01(3)(a)18, Stats., as well.

On reconsideration, the commission found that there had been no violation of subsection 6, but that there had been a violation of subsection 18 and permanently enjoined the dealer from engaging in future violations.

This decision was returned to the circuit court for review, pursuant to Judge Currie's directions. On February 27, 1981, Reserve Judge W. L. Jackman found violations of both provisions and remanded to the commission for appropriate findings. WATDA then appealed to this court.

The questions presented to us, whether either or both statutory provisions include fraudulent or malicious intent as an element of the offense, are questions of law. "Questions of Law, including the construction, interpretation, or application of a statute, are reviewable *ab*

*initio." Boynton Cab Co. v. ILHR* Department, 96 Wis. .2d 396, 405, 291 N.W.2d 850, 855 (1980).

### I. Wilful Failure to Perform

WATDA first contends that sec. 218.01(3) (a)6, Stats., which forbids "[w]ilful failure to perform any written .agreement with any retail buyer," should be strictly con-.strued so as to exempt an automobile dealer when its failure is based on a good faith mistake. We are not so persuaded.

We are convinced by WATDA's initial subargument here, that "wilful" is ambiguous. Even a cursory inspection of Wisconsin case law reveals that the term, "wilful," is capable of at least two distinct meanings. "Wilful" may mean merely intentional. On the other hand, it may signify malice to some degree. *State v. Preston,* 34 Wis. 675, 683–84 (1874). In a criminal context, the latter definition is most frequently used. *Humbird Cheese Co. v. Fristad,* 208 Wis. 283, 290, 242 N.W. 158, 161 (1932).

When a portion of a statute is capable of being understood by reasonably well-informed persons in two or more senses, it is ambiguous. *State v. Derenne,* 102 Wis. 2d 38, 45, 306 N.W.2d 12, 15 (1981). In such event, we must determine the legislative intent from the language of the statute in relation to its scope, history, context, subject matter and object intended to be accomplished. *Heaton v. Independent Mortuary Corp.,* 97 Wis. 2d 379, 394, 294 N.W.2d 15, 23 (1980).

WATDA advances three arguments in defense of its position that "wilful" should be read to mean with malice or an evil purpose. First, it contends that at the time of the initial passage of sec. 218.01, Stats.,[2] our supreme

---

[2] Section 218.01, Stats., was created by ch. 474, Laws of 1935.

court was generally interpreting "wilful" to mean more than merely voluntary conduct. While such may provide some guidance, we find this alone far from conclusive since none of those cases arose out of ch. 218.[3] Moreover, our supreme court has since recognized the modern trend away from strict construction in regulatory legislation. *Security Savings & Loan Association v. Wauwatosa Colony, Inc.,* 71 Wis. 2d 174, 178–79, 237 N.W.2d 729, 731–32 (1976).

Second, WATDA argues that the legislative purpose of ch. 218 is limited to that expressed in *State v. Helwig,* 262 Wis. 299, 301, 54 N.W.2d 907, 908 (1952) : "to protect Wisconsin buyers of motor vehicles from fraud . . . ." Therefore, WATDA argues, "wilful" ought then to mean "fraudulent" or "malicious." We are not persuaded that *Helwig* so provides the alpha and omega of legislative intent behind ch. 218. *Helwig* deals with the initial licensing of motor vehicle dealers rather than with their retail selling practices. The particular provisions addressed in *Helwig* are subsections 218.01 (1) (a) 1 and 2 and (2) (a), Stats., neither of which directly addresses the dealer-buyer relationship. Moreover, a later Wisconsin case, *Vic Hansen & Sons, Inc. v. Crowley,* 57 Wis. 2d 106, 117, 203 N.W.2d 728, 734 (1973), states that "[t]he purpose of sec. 218.01 (6) (c), Stats., is the protection of the purchasers of automobiles, individually, and as a class." Finally, there are provisions of the statutory section in question, sec. 218.01 (3), which are clearly not dependent upon fraud for their vitality, *e.g.,* subsections 1, 25 and 27; as well as subsections which explicitly require fraud as an element, *e.g.,* 3, 5, 8, 9 and

[3] *See, e.g., Simmons Co. v. Industrial Comm'n,* 211 Wis. 445, 449–50, 248 N.W. 443, 445 (1933) (wilful failure to obey safety rules) ; *Humbird Cheese Co. v. Fristad,* 208 Wis. 283, 290, 242 N.W. 158, 161 (1932) (wilful misapplication of funds); *Milwaukee Corrugating Co. v. Industrial Comm'n,* 197 Wis. 414, 419–20, 222 N.W. 251, 254 (1928) (wilful failure to obey safety rules).

10. Thus, it should be clear that fraud is not necessarily the touchstone for a sec. 218.01(3), Stats., violation and, therefore, that sec. 218.01(3), Stats., protects consumers from more than fraud.

Third and finally, WATDA contends that "wilful" ought to be strictly construed because it would avoid a construction in derogation of the common law. WATDA argues that the common law principle of rescission for a good faith unilateral mistake would be overridden if "wilful" were to be construed liberally. While we are not convinced that the doctrine of rescission in Wisconsin is so clear as to assure a dealer's success in a situation such as this, we are not compelled to rule on this because of an important exception to the "derogation rule" where regulatory statutes are concerned. As our supreme court stated in *Security Savings,* 71 Wis. 2d at 179, 237 N.W.2d at 731–32:

"An exception to the rule of strict construction is customarily made in the case of a statute which purports to provide a complete system of law covering all aspects of the subject with which it deals, so as to supersede all prior law on the subject, whether common or statutory law . . . .

". . .

". . . Modern regulatory legislation, moreover, is generally regarded as a newly conceived system of legal arrangements to deal with newly emergent problems in society, entitled to liberal construction because of its remedial character and not subject to the rule of strict construction of statutes in derogation of the common law because its genesis and conception are wholly outside and apart from any common law frame of reference . . . . Sutherland, Statutory Construction (4th ed., 1974), *Statutes in Derogation of the Common Law: Limitations on the rule,* pp. 51, 52, sec. 61.03.

We find the above statement to be a significant and persuasive guide to the interpretation problem at hand.

There can be no question that ch. 218, Stats., is a regulatory scheme or that it is sufficiently detailed enough to be legitimately labelled a "complete system of law" governing the relations between motor vehicle dealers and their retail buyers. It is therefore appropriate that, in keeping with the modern approach to regulatory legislation, we hold that the term, "wilful," in sec. 218.01(3)(a)6, Stats., is to be liberally understood to include both non-accidental and fraudulent acts. Accordingly, we affirm the order of February 27, 1981 directing the Transportation Commission to find that sec. 218.01(3)(a)6, Stats., was violated.

## II. "Bushing"

WATDA's second major contention is that a dealer does not violate sec. 218.01(3)(a)18, Stats., unless the conduct includes an intent to deceive the buyer. Again, we disagree. If legislative intent were at issue here, then the regulatory rationale presented above would be equally applicable to this later subsection of the same statute. However, we do not reach legislative intent on this issue because we find no ambiguity.

Section 218.01(3)(a)18, Stats., reads in full as follows:

(3) LICENSES, HOW DENIED, SUSPENDED OR REVOKED. (a) A license may be denied, suspended or revoked on the following grounds:
. . . .
18. Having accepted an order of purchase or a contract from a buyer if such arrangement results in the practice of bushing. For the purpose of this section, "bushing" means the practice of increasing the selling price of a motor vehicle above that originally quoted the purchaser as evidenced by a purchase order or contract which has been signed by both the purchaser and dealer licensee.

WATDA advances three arguments in favor of a reading in of intent into this provision. WATDA first contends that sec. 218.01(3) (a) 18, Stats., is a penal statute and that *State v. Collova,* 79 Wis. 2d 473, 255 N.W.2d 581 (1977), allows a requisite state of mind to be gleaned from the nature of the particular statute itself.

First, we must examine the statute itself and the possible penalties for its violation. Section 218.01(3) (a), Stats., provides that "[a] license *may* be denied, suspended or revoked" for violation of a subsection. (Emphasis added.) The only other penalty provision is found in sec. 218.01(8) (c), Stats.:

> (c) Any person violating any provisions of this section, except sub. (3) (a) 1, 4, 6, 7, 11, 13, 20, 29 and 30, for which there is no other specific penalty herein may be fined not less than $25 and not more than $100, and imprisoned not to exceed 90 days, or both. In the alternative of the department's prerogative of instituting charges under sub. (3), the department may await a conviction under this subsection and the licensor may cancel the license of the offending licensee without a hearing upon receipt of a certificate of the conviction. The license and registration of such licensee shall be surrendered to any police officer upon the direction of the department without any refund of fees paid. Any license so canceled shall not be renewed during the current year.

In the instant case, the only punishment imposed upon the dealer was an order "permanently enjoining" it from engaging in the practice of bushing.

We believe WATDA's reliance upon *Collova* is misplaced. *Collova* involved a charge of operating a motor vehicle after revocation in violation of sec. 343.44(1), Stats., the penalty for which is given in subsection (2):

> (2) Any person violating this section *may be fined not less than $100 nor more than $400 and shall be imprisoned not less than 10 days nor more than one year in the*

*county jail. . . .* Refusal to accept or failure to receive an order of revocation or suspension mailed by 1st class mail to such person's last-known address shall not be a defense to the charge of driving after revocation or suspension. If such person has changed his address and fails to notify the division as required in s. 343.22 then failure to receive notice of revocation or suspension shall not be a defense to the charge of driving after revocation or suspension.[4] [Emphasis added.]

Our supreme court found that the severity of the penalty was inconsonant with the notion of strict liability and held that cause to believe that one's driver's license had been suspended or revoked was a necessary element of the offense. *Collova,* 79 Wis. 2d at 485–87, 255 N.W.2d at 587–88.

*Collova* may be easily distinguished on at least three bases. First, the severity of the punishment (which was the keystone of the *Collova* decision) in the instant case is not nearly so great. *Collova* involved a *mandatory* jail sentence; there is no such mandatory sentence here. The minimum fine in *Collova* was $100; here, it is $25.

Second, and equally important, is the fact that the *Collova* sanctions are addressed to the public at large. Here, the sanctions are directed only to those engaged in a carefully regulated trade.

Finally, the concepts of scienter or guilty knowledge in *Collova* and in the case at hand are ultimately incomparable. In *Collova,* our supreme court stated: "We do not believe the legislature intended to impose such a severe penalty without some requirement of guilty knowledge as an element of the offense. . . . [T]he statute is in large measure designed to punish those who have *culpably done* that which the legislature has de-

---

[4] The statute has since been amended to reduce the mandatory jail term from ten to five days.

clared to be wrongful." (Emphasis added.) *Collova,* 79 Wis. 2d at 486, 255 N.W.2d at 587. Excusable ignorance of the fact that one's driver's license had been revoked would then absolve a driver from liability. However, the court is equally explicit in speaking of ignorance of the law:

> The defendant's ignorance of the law or negligence as to the existence of the law is not a defense. Thus the defendant's failure to know that driving without a license is a crime is not a defense. Also, the defendant's failure to know which facts or circumstances may subject him to revocation or suspension of his driver's license under Wisconsin law is not a defense. [Footnotes omitted.]

*Collova,* 79 Wis. 2d at 488, 255 N.W.2d at 588. Ignorance of a fact which subjects one to a penalty may be a defense; ignorance of the law or what it means clearly is not.

In the instant case, we know of no fact that the dealer can be said to be ignorant of. At the time that the bushing occurred, the dealer knew of the mistake he had made; the bushing was an attempt to correct it. If anything, the dealer was ignorant that the law provides a penalty for a "good faith" bushing, even though the statute makes no exception for such. Ignorance, then, was ignorance of what the law meant, not of what the facts were. *Collova,* therefore, is inapplicable.

WATDA's second bushing argument is that a strict interpretation of the bushing provision would work an unreasonable and absurd result by preventing buyer and seller from modifying or changing the stated price for legitimate reasons. We do not agree. The bushing provision in no way prevents both parties, upon mutual agreement, from adding or subtracting options and their concomitant prices. This, in essence, would be the

creation of a new agreement. In such situations, sec. 218.01(3) (a) 18, Stats., is inapplicable.

Finally, WATDA argues that since trade usage of the term, "bushing," implies some malicious intent, this court ought to read it in as well. This we cannot do. In sec. 218.01(3) (a) 18, Stats., the legislature has chosen to define "bushing." "As a rule, '[a] definition which declares what a term "means" . . . excludes any meaning that is not stated.' " *Wisconsin Bankers Association v. Mutual Savings & Loan Association,* 96 Wis. 2d 438, 446, 291 N.W.2d 869, 873 (1980). We will not add features or characteristics to the term's statutory definition.

Accordingly, we affirm the order of February 27, 1981 which affirmed the commission's finding that bushing occurred in violation of sec. 218.01(3) (a) 18, Stats., and which set aside the commission's finding that no violation of sec. 218.01(3) (a) 6, Stats., occurred.

*By the Court.*—Order affirmed.