DEPARTMENT OF TRANSPORTATION, State of Wisconsin, Petitioner-Respondent,

WISCONSIN AUTOMOBILE & TRUCK DEALERS ASSOCIATION, INC., Intervenor-Appellant-Petitioner,

v.

TRANSPORTATION COMMISSION, State of Wisconsin, Respondent,

Francis C. WILSON, Intervenor-Respondent.

Supreme Court

*No. 81–596. Submitted on briefs October 6, 1982.— Decided March 1, 1983.*

(Also reported in 330 N.W.2d 159.)

For the intervenor-appellant-petitioner the cause was submitted on the briefs of *Paul R. Norman* and *Wheeler, Van Sickle, Anderson, Norman & Harvey, S.C.,* Madison.

For the petitioner-respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *William C. Wolford,* assistant attorney general.

HEFFERNAN, J.   This is a review of a decision[1] of the court of appeals which affirmed an order of the circuit court for Dane county, W.L. Jackman, Reserve Circuit Judge, presiding.  The order of the circuit court for Dane county, on a review of an enforcement proceeding before the Transportation Commission, affirmed the Commission's finding that there was a violation of sec. 218.01(3)(a)18, Stats., vacated the Commission's finding that there was no violation of sec. 218.01(3)(a)6, and remanded to the Commission with the direction that, as

[1] *Department of Transportation v. Transportation Comm.,* 105 Wis. 2d 678, 315 N.W.2d 371 (Ct. App. 1981).

a matter of law, it make a finding that there was a violation of sec. 218.01(3)(a)6.

The violations charged in these proceedings are based upon provisions of ch. 218, Stats., entitled "Finance Companies, Auto Dealers, Adjustment Companies and Collection Agencies."

Doucas Oldsmobile, an automobile dealership located in New Berlin, Wisconsin, its president, Paul W. Doucas, and John W. Bosworth, its sales manager, upon the complaint of Francis C. Wilson, were charged with the violation of sec. 218.01(3)(a)6,[2] which makes unlawful the wilful failure to perform a written agreement with a buyer, and with the violation of sec. 218.01(3)(a)18,[3] which prohibits "bushing," the practice of increasing the selling price of a motor vehicle above the price quoted a purchaser incorporated in a contract signed by both the purchaser and the dealer.

The basic facts are not disputed. The issue in respect to each of the charges is whether there need be proof of malice or evil intent to find there has been a violation of the statute.

Subsec. (3)(a)6, Stats., requires there be a *wilful* failure to perform. It is contended that wilfulness requires a specific criminal or fraudulent intent or motive. The Department of Transportation, which brought these proceedings, asserts that wilfulness, as used in this statute,

[2] "(3) LICENSES, HOW DENIED, SUSPENDED OR REVOKED. (a) A license may be denied, suspended or revoked on the following grounds:

"6. Wilful failure to perform any written agreement with any retail buyer."

[3] "18. Having accepted an order of purchase or a contract from a buyer if such arrangement results in the practice of bushing. For the purpose of this section, 'bushing' means the practice of increasing the selling price of a motor vehicle above that originally quoted the purchaser as evidenced by a purchase order or contract which has been signed by both the purchaser and dealer licensee."

merely means intentional or voluntary and does not require proof of a malicious, criminal, or fraudulent intent. It was the position of the Transportation Commission that the use of the term, "bushing," in subsec. (3)(a)18 imparts the requirement of deceit or fraud, *i.e.*, that there must be proof that a dealer quoted a lower price with the intention of later increasing the price. The Department of Transportation takes the position that "bushing" is defined by the statute, requires no proof of fraudulent intent, and may be proved by a single act of increasing the price above that quoted in a prior contract.[4]

The court of appeals accepted the arguments of the Department and affirmed the circuit court. We also find those arguments convincing and affirm the decision of the court of appeals.

The basic chronology of the events leading to this litigation is undisputed. Neither party challenged the Commission's findings of fact, so this statement is basically taken from those findings.

Doucas Oldsmobile is a Wisconsin motor vehicle dealership, holding a license issued by the Department to engage in that business activity.

Francis Wilson went to Doucas Oldsmobile on the evening of October 24, 1977, and asked for a price quotation on a diesel engine car. The salesman, Art Cornejo, gave him a quotation. After visiting another dealership, Wilson telephoned Cornejo and said he would buy two cars. He made an appointment for 8:15 the next morning to leave a deposit. It was Wilson's understanding

---

[4] The Transportation Commission, though a named party on this review, is not directly involved in these proceedings, except as it is an administrative tribunal whose order is subject to review under ch. 227, Stats. The interest of the Department of Transportation is represented by the Attorney General. The interest of Doucas Oldsmobile is represented by the intervenors, Wisconsin Automobile and Truck Dealers Association (WATDA).

that Cornejo would have the purchase agreements ready for his signature when he arrived.

On October 25, 1977, Cornejo arrived at the dealership a little late, and the switchboard operator told him that Wilson had left a $300 deposit for two cars. Cornejo went outside and flagged down Wilson, who was driving away. Wilson said he was very pressed for time. Cornejo said he should come inside, that it would not take long to list out the equipment. Cornejo wrote up the purchase documents. Wilson signed them, and Cornejo had them approved by the manager, Bosworth. According to Cornejo, Wilson was only at Doucas' "not more than 15 minutes." Wilson said he was there for about twenty-five minutes. It appeared that Cornejo and Bosworth hurried to accommodate Wilson. On the other hand, it appeared that Wilson was willing to return later so the transaction could be completed in a more leisurely fashion.

Cornejo made a mistake in completing the purchase contracts. The contracts specified diesel engines, but Cornejo did not add in the additional price of the diesel engines. The manager, Bosworth, reviewed and approved the agreements without seeing the mistake.

The mistake was discovered about two days after the agreements were signed. Cornejo immediately phoned Wilson and explained the mistake. Cornejo got the impression that Wilson would be willing to pay the extra amount. Wilson was actually unwilling to do so and told Cornejo to order the cars. Doucas Oldsmobile did not perform the contract as written. The Commission found that Doucas told Wilson he could have the vehicles only if he agreed to pay a higher price than was stated in the contract. Eventually the vehicles were delivered at a negotiated price.

All parties agree that the omission of the add-on price for the diesel-engine option was the result of a good-faith mistake.

Upon complaint to the Department of Transportation, that agency commenced proceedings before the Transportation Commission to issue a special order enjoining Doucas Oldsmobile-Renault from future violations of secs. 218.01 (3) (a) 6 and 218.01 (3) (a) 18.[5]

The first question to be addressed on this review is whether a motor vehicle dealer violates sec. 218.01 (3) (a) 6, Stats., *i.e.*, commits a "wilful failure to perform [a] written agreement with [a] retail buyer" when it intentionally declines to perform the written agreement because its own unilateral mistake or negligence resulted in an agreement price that was below the dealer's cost.

We note initially that, although the Transportation Commission in this proceeding seeks only an injunction to prohibit further violations of the statute by Doucas Oldsmobile pursuant to sec. 218.01 (3) (h), Stats., the same subsection of the statutes permits, after hearing, the revocation or suspension of licenses issued under this chapter. However, no fine or imprisonment is possible.

We also note that the Department did not file a complaint because Doucas made a mistake in its price; but, rather, it filed the complaint because Doucas, having discovered its mistake, intentionally declined to perform the written agreement previously entered into with the buyer. There is no doubt that it refused to perform the agreement. The question, however, is whether that refusal was wilful. The circuit court determined, and the court of appeals agreed, that "wilful," as used in the statute, meant no more than "intentional" and that, because the refusal was clearly intended, the statute was

---

[5] Originally the Department also sought the suspension of the vehicle salesperson licenses of Paul W. Doucas and John W. Bosworth for a period of ninety days. Prior to the hearing, that demand was deleted from the complaint. At the same time the complaint was amended, WATDA was allowed to intervene. The proceedings were referred to in correspondence of the Commission as "a motion to dismiss and/or a declaratory ruling."

violated. WATDA does not dispute the finding that Doucas' act was intentional, but it asserts that the conduct must be with an evil intent or with malice, or without justifiable excuse. It asserts that these elements are not present, that there was no evil intent, and that there was merely an innocent unilateral mistake, which justified the dealer in refusing to carry out the erroneous agreement.

It is the position of the Department that no evil intent or purpose to defraud be shown—that all that is required is that the act be intentional, *i.e.*, wilful, and not involuntary or accidental.

The term, "wilful," is ambiguous and is susceptible to many meanings. This court, over one hundred years ago, stated:

"The word *willfully*, as used to denote the intent with which an act is done, is undoubtedly susceptible of different shades of meaning or degrees of intensity according to the context and evident purpose of the writer." *State v. Preston*, 34 Wis. 675, 683 (1874).

This court in *Preston* acknowledged that, where the word was used in a criminal statute, the concept of "legal malice" was expressed, but in other cases it would "mean little more than plain *intentionally*, or *designedly*." P. 683.

*Preston* makes clear that there is no one and certain meaning that can be ascribed to "wilful" which will in all cases convey its meaning. A word or term which can reasonably be understood in more than one sense or can convey more than one meaning is ambiguous. *See, Wisconsin Bankers Asso. v. Mutual Savings & Loan Asso. of Wis.*, 96 Wis. 2d 438, 450, 291 N.W.2d 869 (1980).

In the absence of ambiguity, it is the duty of the court to give words of a statute their obvious and ordinary

meaning without resort to legislative history, rules of interpretation, or canons of construction. Where, however the meaning is ambiguous, it is the duty of the court, to the extent that it is able to determine the legislative intent, to ascertain as best it can the sense in which the legislature used an ambiguous word or phrase.

". . . this court 'must ascertain the legislative intention as disclosed by the language of the statute in relation to its scope, history, context, subject matter, and the object intended to be remedied or accomplished.' " *Wisconsin Southern Gas Co. v. Public Service Comm.*, 57 Wis. 2d 643, 648, 205 N.W.2d 403 (1973), citing earlier Wisconsin cases.

In finding that the term, "wilful," is ambiguous, we must conclude either that the legislature intended to punish automobile dealers only if with malice or with an evil intent they determined not to perform a written agreement with a customer or the legislature intended to penalize a dealer merely because he intentionally refused to perform a written agreement inadvertently entered into because of an innocent act of negligence, a unilateral mistake.

The legislative history is not persuasive one way or the other. None of the parties to this action have brought to our attention anything in the files of the Legislative Reference Bureau that would indicate what the legislature intended "wilful" to mean in sec. 218.01(3)(a)6, Stats.

WATDA suggests as a guideline to the meaning that "wilful" should be given the meaning ascribed to it by the Wisconsin Supreme Court at the time the basic legislation of sec. 218.01, Stats., was enacted in 1935 and prior thereto. While that approach to determining the meaning no doubt is a sensible suggestion, that inquiry, too, ends in ambiguity. As pointed out above, *Preston, supra,* which prior to 1935 and to the present is a leading authority on the nuances of the word, "wilful," points

out that the word is pregnant with ambiguity, and that its meaning varies in accordance with its context.

Although *Preston* antedated the statute by over sixty years, a case of this court only seven years prior to the enactment of sec. 218.01, Stats., reveals the same uncertainties. *Milwaukee Corrugating Co. v. Industrial Comm.*, 197 Wis. 414, 420, 222 N.W. 251 (1928), in discussing the meaning of "wilful" in a workers compensation statute, quoted 40 Cyc 938:

" 'The words "wilful" and "wilfully" are of somewhat varied signification according to the context in which they are used in particular cases and the nature of the subject under discussion or treatment. They are frequently used in the sense of intentionally, or in other words as implying a purpose or design, or proceeding from a conscious motion of the will as distinguished from accidentally or involuntarily; and they are accordingly used in the sense of or as equivalent to willingly; designedly; purposely; obstinately; stubbornly; inflexibly; perversely; voluntarily; deliberately; with set purpose; being governed by the will, without regard to reason, or without yielding to reason. . . .' "

WATDA has cited numerous cases for the purpose of demonstrating that "wilful" at the time of the drafting of the statute was understood to mean having an evil intent. While, in many of the cases, this court did hold that the term imparted a requirement of malice, they are primarily criminal cases, and what the cases cited by the intervenors really demonstrate is that this court has consistently recognized that the meaning of the word varied with the context in which it was used.

■

Even to the extent that the cases cited by WATDA, *e.g.*, *Simmons Co. v. Industrial Comm.*, 211 Wis. 445, 449, 248 N.W. 443 (1933), interpret "wilful" to mean "obstinate, stubborn, and perverse," it is difficult to see how Doucas is helped by that interpretation. It would appear

that those adjectives could, under the evidence, be applied by a reasonable finder of fact to characterize the refusal of Doucas to perform its agreement. We need not, however, adopt any abstract definition urged by WATDA either to agree or to disagree with its point of view. What the intervenor has proved is that precedent is not a reliable determinant of the meaning of a word that this court has found to be inherently ambiguous. We are obliged to determine the meaning of "wilful" in the instant case within the framework of the statute itself, including the statute's purpose, its subject matter, and its context, including how the questioned word is used elsewhere in the same statute, as a clue or guideline to what the legislature intended by the use of the word. We find no lodestar precedent in Wisconsin decisions which will guide us to a meaning of "wilful" that with certainty reflects the intention of the legislature.

WATDA also argues that the statute is in derogation of common law and, therefore, must be strictly construed. Insofar as WATDA's argument stands for the proposition that "wilful" under the common law means with evil or malicious intent, the discussion above demonstrates that, even at common law, the word had no such certain meaning. It is meaningless in the context of this case, where it cannot be said that the statute is criminal in nature, to say that the word must be interpreted strictly to give a criminal the rights he clearly would be accorded at common law. It is not a statute that at common law would impose common law criminal penalties. This is not a penal statute.

While this criminal law argument lurks in the peripheries of WATDA's thesis, it more prominently asserts that this statute, interpreted as it has been by the circuit court and court of appeals, is in derogation of its common law remedy of reformation of a contract or its right to rescission.

In the courts prior to this review, WATDA asserted that, because it had the common law right to rescind, it could repudiate the contract without evincing any improper or malicious intent and, hence, at common law remedies are granted that are denied under the statutes. We do not herein determine the right of one in the position of Doucas to rescind, in circumstances not governed by ch. 218, Stats. However, the authority upon which WATDA relies for the right of rescission, *Miller v. Stanich*, 202 Wis. 539, 230 N.W. 47 (1930), does not support that proposition. Even in circumstances where equitable rescission is allowable in the case of a unilateral mistake, *Miller* points out:

"Generally the mistake must have occurred notwithstanding the exercise of ordinary diligence by the party making the mistake." P. 549.

Here, there was an express finding by the Commission that Doucas failed to act with due care in preparing the original agreement.

We are not convinced by WATDA's argument that, under the circumstances here, it had the right to rescind and that, therefore, the attempted repudiation of the contract was innocent and not based on a malicious intent to escape from an improvident contract.

Thus, it does not appear, under the facts, that Doucas had a common law remedy. We are not persuaded that, in respect to rescission or reformation, the statute denies a right afforded by the common law.

The very nature of the statute indicates that it is one intended to provide remedies where the common law provided none. This statute provides a regulatory system in respect to the relationship between manufacturers and dealers and dealers and retail customers. It clearly seeks to deal with problems that did not exist prior to

the mass production of the automobile and the concomitant nation-wide network of dealerships. Although we are not concerned with the financing of automobiles in the present case, the same chapter deals with the regulation of automobile finance companies. Thus, we have a broad and sweeping type of new legislation that regulates the automobile business in many of its aspects.

Although the statute is clearly a part of a wide ranging regulatory system, WATDA would have us construe it strictly. Under the strict construction urged, "wilful" should be construed to mean "with evil or malicious intent." As our previous discussion has indicated, even a strict construction of this, a non-penal statute, does not, because of the inherent ambiguity of the word, necessarily yield that result, even as used at common law.

But strict construction is inappropriate here. As the court of appeals ably demonstrated, that rule of construction does not apply to a statute creating a regulatory system. This court stated the rule and its rationale in *Security S. & L. Asso. v. Wauwatosa Colony*, 71 Wis. 2d 174, 179, 237 N.W.2d 729 (1976), when it stated:

" '. . . An exception to the rule of strict construction is customarily made in the case of a statute which purports to provide a complete system of law covering all aspects of the subject with which it deals, so as to supersede all prior law on the subject, whether common or statutory law . . . .

" '. . .

" '. . . Modern regulatory legislation, moreover, is generally regarded as a newly conceived system of legal arrangements to deal with newly emergent problems in society, entitled to liberal construction because of its remedial character and not subject to the rule of strict construction of statutes in derogation of the common law because its genesis and conception are wholly outside and apart from any common law frame of reference . . . .' Sutherland, Statutory Construction (4th ed., 1974), *Statutes in Derogation of the Common Law: Limitations on the rule*, pp. 51, 52, sec. 61.03."

WATDA, however, insists that the rule stated by Sutherland is inapplicable because this court has recognized that some of the relationships considered in ch. 218, Stats., are also subject to provisions of the Uniform Commercial Code. However, no regulatory legislation can or could purport to supplant all existing law. Certain fundamental relationships and rights must be left to general principles and to constitutional guarantees. Thus, no code can be complete. Other statutes and basic principles are still applicable in respect to the interstices of the new regulations; but, in respect to a relationship, which a new public welfare code purports to regulate, it must be given primacy and is not subject to the derogation rule. There is no requirement that a code be "exclusive." It need only be complete in respect to the aspects of relationship it seeks to regulate.

It is clear that ch. 218, Stats., fits precisely within the category of legislation described by Sutherland, " 'a newly conceived system of legal arrangements to deal with newly emergent problems in society.' " P. 179.

Moreover, the proof of fraudulent or malicious intent is difficult, requiring either the middle or highest burden of proof. To so interpret the statute would defeat its purpose. While this is not a controlling consideration, for it is always easier to prove a case if the element of *mens rea* is removed, here the statute is non-penal; and it makes no sense to require a higher burden of proof than that required in other civil regulatory schemes. Basically, this is a consumer-protection statute, and enforcement should be facilitated to the extent that it may be consistent with the legislative intent. Here, where there are no penal sanctions, we ought not, by strictly construing the statute, place obstacles in the path of enforcement that the legislature did not clearly intend.

A reading of other sections of the same subsection reveals that, when the legislature intended that there be

proof of fraud, it said so. Sec. 218.01(3)(a), Stats., specifically refers to fraudulent conduct in other paragraphs —3, 5, 8, 9, and 10. It referred, respectively, to conduct by a dealer in filing a fraudulent tax return, defrauding a retail buyer, making a fraudulent sale, making fraudulent misrepresentation, and employment of fraudulent practices in connection with retail sales. The section with which we are concerned, sec. 218.01(3)(a)6, uses the term, "wilful." Had the legislature intended fraud or malice to be the trigger for the violation, it clearly would have said so. Additionally, were fraud a factor in the present case, the transaction would, arguably at least, fit under one of the sections above enumerated. Hence, it seems rather clear that the section under which enforcement is sought is a separate, but nonfraudulent, offense.

It is also contended that the whole chapter is designed to protect against fraud; and, hence, it is fraud that must be proved. WATDA relies upon our statement in *State v. Helwig*, 262 Wis. 299, 301, 54 N.W.2d 907 (1952), that the statute was designed "to protect Wisconsin buyers of motor vehicles from fraud." The statement is, of course, correct; but it does not reflect the complete purpose of the statute. Fraud was not an issue in *Helwig*, the issue was whether licensing constituted a burden on interstate commerce. This court held it did not. The most relevant point to be gained from *Helwig* is that it demonstrated that fraud may be prevented by regulating nonfraudulent conduct. Licensing, *ipso facto*, has nothing to do with fraud; yet, according to *Helwig*, it serves the purpose of preventing fraud. Thus, it does not follow from *Helwig* that only fraudulent conduct is regulated by sec. 218.01, Stats.

It should also be noted that this court in *Kuhl Motor Co. v. Ford Motor Co.*, 270 Wis. 488, 71 N.W.2d 420 (1955), emphasized that the purpose of ch. 218, Stats.,

in respect to manufacturers was to ensure fair dealing. *Kuhl* announced that the state could regulate unfair practices even if they were not fraudulent.

In *Forest Home Dodge, Inc. v. Karns,* 29 Wis. 2d 78, 138 N.W.2d 214 (1965), we referred to sec. 218.01(3) (f), Stats., as "remedial"; and, consistent with the arguments posed by WATDA in that case, we concluded that traditional contract law was not controlling, but rather the statute was to be liberally construed to effect the legislative intent to protect Wisconsin auto dealers from predatory and avaricious manufacturers. It was not required that there be proof that the manufacturer's conduct was fraudulent. *Forest Home Dodge, Inc.,* is instructive on at least two counts. The statute is to be liberally construed, and fraud is not a requirement to trigger the protection of Wisconsin citizens who are automobile dealers.

We think that the analysis of the facts of this case and of the statute pertinent here and the application of analogous portions of ch. 218, Stats., by this court in the past provides convincing evidence that the statute here is to be liberally construed and that "wilful," as so used, means "intentional"—that fraud or malice are not elements to be proved where a dealer has not conformed to the requirements of sec. 218.01(3)(a)6. It is enough that a dealer intentionally, *i.e.,* "wilfully," failed to perform a written agreement with a retail buyer.

The interpretation given here furthers objectives that WATDA espouses and encourages. WATDA recognizes that sec. 218.01, Stats., by its licensing provisions ensures honesty, integrity, competency, and financial stability of licensed dealers and salespersons. We are satisfied that our decision furthers those purposes, which are clearly consistent with the legislature's intent. By this opinion, we hold that a dealer who has made a uni-

lateral mistake may not refuse to perform the agreement with a customer. We are satisfied that such a rule, as envisaged by the legislative enactment, will ensure that dealers and salespersons avoid the negligent conduct found by the Commission in this case.

It was also argued that, under the rationale urged by the Department, a dealer who has entered into an agreement as the result of the fraudulent representations of a purchaser will nevertheless be required to perform. That case is not before us, but we see nothing in the statute that affords protection to one who defrauds a dealer. Our holding could not be so construed. We hold only that, where an agreement exists between a retail buyer of an automobile and a motor vehicle dealer, the failure to perform, if intentional, is in violation of the statute. It constitutes a "wilful" failure to perform. In this case, no attack has been made on the underlying "agreement." The nature of the agreement is not at issue here.

We affirm the decision of the court of appeals affirming the order of the circuit court directing the Transportation Commission to find that sec. 218.01(3)(a)6, Stats., was violated.

The Transportation Commission determined that there was a violation of sec. 218.01(3)(a)18, Stats., when Doucas Oldsmobile increased the quoted price of the automobiles subsequent to execution of the purchase order by both the dealer and Wilson, the purchaser. This finding was affirmed by the circuit court and the court of appeals.

In the courts involved in this case prior to this review, WATDA apparently took the position that the statute only prohibited the "practice" of "bushing" and, hence, even were the episode herein an instance of "bushing"

there was no such practice by Doucas. This position is not reasserted on this review. We believe the original argument unsupportable. The statute itself defines "bushing":

"218.01 (3) LICENSES, HOW DENIED, SUSPENDED OR REVOKED. (a) A license may be denied, suspended or revoked on the following grounds:

"18. Having accepted an order of purchase or a contract from a buyer if such arrangement results in the practice of bushing. For the purpose of this section, 'bushing' means the practice of increasing the selling price of a motor vehicle above that originally quoted the purchaser as evidenced by a purchase order or contract which has been signed by both the purchaser and dealer licensee."

Thus, under the statute, from an evidentiary viewpoint, "bushing" is proved by showing there was an increase in the sales price after a price quotation "as evidenced by *a* purchase order or contract." (Emphasis supplied.) By the legislative definition, then, a single act is sufficient to constitute "bushing." Judge Jackman well disposed of the contention when he stated in his circuit court opinion:

"Also it has been argued that the use of the word 'practice' in the second sentence of the subparagraph relating to bushing, requires that more than one incident is necessary to bushing. The dictionaries recognize that 'practice' may mean either repetitious actions or a single action. The use of the singular in the definition of bushing such as: '. . . increasing the selling price of a motor vehicle. . . .' and '. . . evidenced by a purchase order or contract . . .' makes it clear that a single incident may be a 'practice of bushing.' If that not be true, how many instances need there be to be a 'practice of bushing'?"

The principal argument on this review is that bushing contemplates an intent to deceive, and that here, where

the error in the original agreement was innocent, though negligent, there was no evil or malicious intent to quote a low price for the purpose of "hooking" a buyer and then later confronting him with a higher price.

While WATDA has furnished us with definitions of bushing that clearly indicate that there can be some malicious intent to deceive, those definitions are irrelevant, for the statute itself defines bushing and makes no mention of deceptive intent. Thus, even were we to accept the definition offered by WATDA as being the one used by the trade prior to the enactment of the statute, and even though the offered definition is also correct, the legislature has the clear authority to define the terms as it sees fit. It has done so here.

WATDA offers the definition of "bushing" as set forth in Professor Macaulay's law review article:

> *"Bushing*—Luring a buyer by offering a bargain price, then hiking the price. The original offer is made by a salesman 'subject to the manager's approval.' The manager later indignantly disclaims it and persuades the buyer, by this time emotionally committed, to accept the higher price. In some cases bushing is cruder—the buyer is given a price, persuaded to sign a blank sales agreement. Later he finds it has been filled in for much more than he expected to pay." Macaulay, *Changing a Continuing Relationship Between a Large Corporation and Those who Deal With It: Automobile Manufacturers, Their Dealers and the Legal System,* 1965 Wis. Law Rev. 483, 501–02, n. 57.

It is at once apparent that the reprehensible practice described and defined by Macaulay does not comport with the definition enacted by the Wisconsin legislature. Had the legislature not defined the term, the usage of the trade, as described by Professor Macaulay, would be persuasive. In light of the definition, it is irrelevant.

Paul W. Doucas, president of Doucas Oldsmobile, when asked to define "bushing," did not assert that a malicious

or fraudulent intent was required. He said, in response to counsel for the Department:

"The term bushing is making an agreement with somebody and then subsequently trying to increase the price of that, or whatever the—it was—make it more expensive."

When Doucas was re-examined by his own counsel, he expanded on his definition, saying:

". . . you make an agreement or purchase contract with a customer and you intentionally attempt to change the price for a greater return subsequently."

Again, there was no assertion that a malicious or evil intent was required. Doucas' definition fits precisely with the facts adduced in this proceeding. An agreement was made, and thereafter the dealer intentionally attempted to increase the price. The record demonstrates that there was absolutely no doubt that Doucas subsequently and intentionally attempted to amend the agreement to secure a higher price. The conduct was not evil; it was not malicious; but it was volitional and intentional.

Although no criminal sanctions are sought in this case, the violation charged could have resulted in a forfeiture of "not less than $25 and not more than $100, and imprisoned not to exceed 90 days, or both." Sec. 218.01 (8) (c), Stats. Although this penalty provision has been repealed effective April 27, 1982, it was in effect at the time of the violation and during the evidentiary proceedings. Hence, the statute was penal in nature. Despite a dissent, which to this writer is convincing, this court held in *State v. Alfonsi*, 33 Wis. 2d 469, 476, 147 N.W.2d 550 (1967), that "the element of scienter is the rule rather than the exception in our criminal jurisprudence." However, this court has long recognized that the legislature may, at least in some circumstances, create crimes

with no element of criminal intent. For example, *State v. Hartfiel,* 24 Wis. 60 (1869) (serving liquor to a minor); *State v. Stepniewski,* 105 Wis. 2d 261, 314 N.W.2d 98 (1982) (failure to obey regulations of the Department of Agriculture, Trade, and Consumer Protection).

WATDA places reliance on *State v. Collova,* 79 Wis. 2d 473, 255 N.W.2d 581 (1977), as a case in which this court held that an element of scienter was required despite the absence of spelling out that factor in the statutes.

*Collova* involved the offense of operating a motor vehicle after revocation, in violation of sec. 343.44(1), Stats. Sec. 343.44, Stats., imposes a mandatory jail sentence of ten days, with up to one year imprisonment possible. The court said that liability without fault has been imposed in regulatory statutes concerned primarily with protection of social and public interests. 79 Wis. 2d at 482. Such offenses are usually created to enforce a high standard of care for the protection of the public. 79 Wis. 2d at 485.

"The persons to whom the regulations are directed are generally in a position to exercise such high degree of care; they will be encouraged to do so by the imposition of strict penal liability, and the penalties usually involved are such as to make the occasional punishment of one who has done everything that could have been done to avoid the violation a reasonable price to pay for the public benefit of the high standard of care that has been induced. Thus where the statute is not explicit, one of the principle indexes courts consider on the question whether some element of knowledge is required is the severity of the penalty involved. 79 Wis. 2d at 485.

The statute in *Collova* applied to a large segment of the public—those who operate automobiles.

"The driving of a motor vehicle by one who has neither knowledge nor reason to know that his operating privi-

lege is or may have been revoked is a wholly routine and innocent act." 79 Wis. 2d at 486.

Inflicting punishment on individuals who have no cause to believe their licenses might be suspended or revoked would not be effective in reducing the incidence of driving after revocation. Given these considerations and the severe penalty involved, the court decided that the legislature meant to require some degree of guilty knowledge. It held that an element of the offense is that the defendant has cause to believe his driver's license might be revoked or suspended. 79 Wis. 2d at 487.

As the court of appeals pointed out, there are several differences between the statute involved in this case and the statute in *Collova*. This statute applies only to motor vehicle dealers and salespersons. The business is highly regulated. Dealers and salespersons may reasonably be held to know of the provisions of the statutes regulating them. No mandatory penalties are involved, and the maximum term of imprisonment is less than for operating after revocation.

In this case, unlike the situation of the defendant in *Collova*, it is not a question of whether the dealer was unaware of some fact which made its action a violation of the law. It is difficult to imagine a dealer unknowingly increasing the price of a motor vehicle above that stated in the contract. The individuals involved would almost have to know that they were increasing the price, so inflicting punishment would be effective in reducing the incidence of "bushing."

This case is similar to *Stepniewski, supra,* where this court refused to require the state to prove that violations of the statute were intentional. The court focused on the purpose of protecting the public and on the absence of mandatory jail sentences. Fines of up to $5,000 and imprisonment of up to one year were possible in *Stepniewski*. Here, by comparison, the sanctions are nominal.

Doucas intentionally increased the price of the motor vehicles above what was stated in the contracts. Accordingly, we are not dealing with a strict liability offense.

Doucas, unlike Collova, was fully aware of all the facts. It cannot claim ignorance of the law. While there is no evidence of malice or evil purpose, the conduct was intentional. The *Collova* rationale is only peripherally pertinent to the present case. We decline to impart an element of scienter where the legislature failed to do so and did inject such a requirement in other portions of the same statute. No element of malicious or evil intent is required by either the statute itself or the rationale utilized in *Collova* which compels the element of *mens rea* in respect to offenses which carry substantial and mandatory penal sanctions.

We conclude that the court of appeals correctly affirmed the order of the circuit court determining that Doucas had violated both secs. 218.01(3)(a)6 and 218.01 (3)(a)18, Stats., and directing a remand to the Transportation Commission for the entry of the appropriate order.

*By the Court.*—Decision affirmed.

DAY, J., took no part.